UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

H.A.L, *individually and on behalf of M.L., a child with a disability*,

Plaintiff,

-v.-

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

24 Civ. 6879 (KPF)

**OPINION AND ORDER**

---

KATHERINE POLK FAILLA, District Judge:

Plaintiff H.A.L., individually and as parent and legal guardian of M.L., brings this motion for summary judgment, seeking a judicial determination that the New York City Department of Education ("DOE" or "Defendant") failed to offer M.L. a free appropriate public education ("FAPE") for the 2023-2024 school year, as mandated by the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400-1485. Plaintiff also seeks a determination that her unilateral placement of M.L. at the Academy for Young Minds (the "Academy") for the 2023-2024 school year was appropriate and that equitable considerations warrant reimbursement of Plaintiff for the cost of M.L.'s attendance at the Academy. In so moving, Plaintiff appeals from the contrary decision of State Review Officer ("SRO") Justyn Bates, who affirmed the decision of Impartial Hearing Officer ("IHO") Teril Holston that DOE provided M.L. a FAPE. Defendant cross-moves for summary judgment, asking this Court to affirm the decision of SRO Bates. For the reasons set forth below, the Court grants Defendant's motion and denies Plaintiff's motion.

**BACKGROUND**[1]

A.    **Factual Background**

1.    **The State's Obligation to Provide a FAPE Under the IDEA**

Under the IDEA, the federal government provides funding to states in support of special education programs and services for children with disabilities.  *See generally* 20 U.S.C. §§ 1411-1419.  To receive federal funding, a state must submit a plan to the Secretary of Education "that provides assurances to the Secretary that the State has in effect policies and procedures to ensure that" a FAPE is available to all children with disabilities residing in the State.  34 C.F.R. § 300.100.

In furtherance of this mandate, the IDEA requires each state to identify all children in the state with disabilities requiring special education programs and services and to develop an appropriate "individualized education program" ("IEP") for each child.  20 U.S.C. § 1412(a)(3)-(4).  New York law defines an IEP as "a written statement ... which includes the [programs and services] ... to be

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with the parties' cross-motions for summary judgment.  The Court primarily sources facts from the administrative record ("Record" (Dkt. #32-1)), which the Court ordered sealed in light of the personally identifying information relating to a minor child and his family contained therein (*see* Dkt. #33), including the decisions of the IHO ("IHO Dec." (Dkt. #32-1 at 22-38)) and the SRO ("SRO Dec." (Dkt. #32-1 at 6-21)) and M.L.'s Individualized Education Program for the 2023-2024 school year ("IEP" (Dkt. #32-1 at 253-75)), as well as the Complaint ("Compl." (Dkt. #9)).

For ease of reference, the Court refers to Plaintiff's memorandum of law in support of her motion for summary judgment as "Pl. Br." (Dkt. #35); to Defendant's memorandum of law in opposition to Plaintiff's motion and in support of its cross-motion for summary judgment as "Def. Br." (Dkt. #37); to Plaintiff's memorandum of law in further support of her motion and in opposition to Defendant's cross-motion as "Pl. Reply" (Dkt. #39); and to Defendant's memorandum of law in further support of its cross-motion as "Def. Reply" (Dkt. #40).

provided [by the state] to meet the unique educational needs of a student with a disability." 8 N.Y.C.R.R. § 200.1(y); *see also id.* § 200.4(d)(2) (describing the components of an IEP). A child's IEP is reviewed and, if necessary, revised on a periodic (but no less than annual) basis. 20 U.S.C. § 1414(d)(4)(A).

In New York State, IEPs are developed by Committees on Special Education ("CSEs"), which are convened by the board of education or trustees of the school district in which each covered student resides. N.Y. Educ. Law § 4402(1)(b)(1). Each CSE is a "multidisciplinary team" of people, 8 N.Y.C.R.R. § 200.1(z), that evaluates and places a covered student in appropriate special educational programming, N.Y. Educ. Law § 4402(1)(b)(1). Generally speaking, a CSE comprises the student's parents, regular education teacher, special education teacher, and school psychologist, among others. *Id.* § 4402(1)(b)(1)(a). In determining the student's educational needs, the CSE will "obtain, review[,] and evaluate all relevant information," including, where appropriate, "assessments ... necessary to ascertain the physical, mental, emotional[,] and cultural-educational factors which may contribute to his suspected or identified disability[.]" *Id.* § 4402(1)(b)(1)(d)(3)(a). By federal regulation, a CSE must take into consideration the concerns of a student's parents as it formulates that student's IEP. 34 C.F.R. § 300.324(a)(1)(ii).

For a parent dissatisfied with the results of their child's IEP, New York has established a "two-tier system of administrative review" to ensure compliance with the IDEA's procedural requirements. *Murphy* v. *Arlington Cent. Sch. Dist. Bd. of Educ.*, 297 F.3d 195, 197 (2d Cir. 2002) (citing N.Y.

Educ. Law § 4404). "The first tier entitles parents dissatisfied with a proposed IEP to have it reviewed before an [IHO] appointed by the board of education." *Mackey ex rel. Thomas M.* v. *Bd. of Educ. for Arlington Cent. Sch. Dis.*, 386 F.3d 158, 160 (2d Cir. 2004) (citing N.Y. Educ. Law § 4404(1)). Then, at the second tier, "parties aggrieved by the outcome of the [first-tier] due process hearing may pursue an appeal before a[n] [SRO]." *Murphy*, 297 F.3d at 197 (citing N.Y. Educ. Law § 4404(2)). Any party still aggrieved by an SRO's findings after the state administrative review process may bring a civil action challenging such findings in state or federal court. 20 U.S.C. § 1415(i)(2)(A); *see also Mackey*, 386 F.3d at 160.

### 2.  M.L.'s Background

M.L. is Plaintiff's son and was born in 2012. (Pl. Br. 4; Def. Br. 7). During the time period relevant to this case, M.L. was completing fifth grade and preparing to enter sixth grade. (SRO 2-3; Pl. Br. 1; Def. Br. 7-8). M.L. experiences a variety of impairments often associated with autism. (*See* Compl. ¶ 2; IHO Dec. 4 (explaining that a private neuropsychologist found M.L. "met the criteria for Autism Spectrum Disorder, Level 2-Requiring Substantial Support"); SRO Dec. 11 (describing a Psychoeducational Assessment that "reserved" "the classification of Autism" (quoting Record 294))). He has speech and language impairment and attention deficit/hyperactivity disorder (IHO Dec. 4; Record 286, 302), as well as impulsivity, inappropriate classroom behaviors, repetitive behaviors (*e.g.*, flapping his hands, inappropriate noises, and fidgeting), social difficulties, restricted interests, and tantrums (Compl.

¶ 20; IHO Dec. 5; Record 107).  M.L. has received special education services since pre-school.  (Record 286).  Those services include "physical therapy, occupational therapy, speech/language therapy and counseling from early intervention services."  (*Id.* at 299).  Although M.L. does not like to interact with "anyone aside from his immediate family," he is "a sweet young boy that gets along with his family members" and is "loving" and "respectful."  (*Id.* at 300, 302).

Prior to the events at issue in this case, M.L. attended a DOE-operated public school from kindergarten through fifth grade.  (SRO Dec. 2).  For M.L.'s sixth grade year in 2023-2024, a CSE convened to develop an IEP and recommended M.L.'s continued placement in a DOE-operated public school.  (*Id.* at 2-3; IHO Dec. 4-6; Def. Br. 7-8).  But Plaintiff believed that placement to be inappropriate and instead enrolled M.L. in the Academy for the 2023-2024 school year, thus giving rise to the present controversy.  (SRO Dec. 3; IHO Dec. 6; Pl. Br. 4 (citing Record 155, 158-72); Def. Br. 8).

## B.    Procedural Background

### 1.    Development of M.L.'s IEP for the 2023-2024 School Year

The CSE convened on June 16, 2023, to develop M.L.'s IEP for the 2023-2024 school year.  (SRO Dec. 2-3; *see also* IEP).  To do so, the CSE considered information from a variety of sources and discussed M.L.'s academic challenges and progress at length.

The CSE found M.L. eligible for special education as a student with a speech or language impairment and noted that he functioned "at least [four]

grade levels behind" across subject areas.  (IHO Dec. 4).  In math, he functioned at a first-grade level but had "some success when working 1:1 with a teacher, using modeling along with repetition and guided practice."  (*Id.*).  Indeed, the CSE noted that M.L. had "met his previous addition and subtraction goal of adding and subtracting with regrouping, up to the hundreds place."  (*Id.*; *see also* IEP 2).  With respect to reading, M.L.'s overall reading level "had not changed[,] which ma[de] it extremely difficult with the 5th grade curriculum," but he "did accomplish some of the reading goals in his prior IEP."  (IHO Dec. 5; *see also* IEP 3).  And in writing, M.L. performed on a kindergarten level "but made progress to his goals and participate[d] more."  (IHO Dec. 5; *see also* IEP 3).  He was "able to write three[-]word dictated sentences" and could "develop an idea and write about it," although he "struggle[d] with thought organization."  (IHO Dec. 5; *see also* IEP 3).

Behaviorally, M.L. also showed some improvement.  Though he "continue[d] to have difficulty engaging with his peers" because he was sometimes "unable to remain on topic" and did not "pay[ ] attention to social cues," he received counseling and had made progress in expressing his emotions and developing problem-solving skills.  (IHO Dec. 5; *see also* IEP 5).  He could also easily be brought back to "baseline when reminded he will get a turn to speak."  (IHO Dec. 5; *see also* IEP 5).  And though he "bec[ame] upset" when faced with a "difficult task," after a "short conversation, most times he w[ould] begin the task."  (IHO Dec. 5; *see also* IEP 5).

M.L. also began receiving physical therapy during the 2022-2023 school year.  (IHO Dec. 5).  But the IEP observed that he had met all of his goals in physical therapy and was "discharged from [physical therapy] services because his gross motor function d[id] not impede his ability to perform his academic activities."  (*Id.*; *see also* IEP 7).  Similarly, in occupational therapy, M.L. had "improved and met his goals of manipulating classroom tools appropriately and fine motor skills, [and] no longer required an individual [occupational therapy] session each week."  (IHO Dec. 5; *see also* IEP 7).  According to the IEP, though, he still required "a group of [two] session to improve sensory processing and executive functioning skills."  (IHO Dec. 5; *see also* IEP 7).

In light of both M.L.'s progress and his continued challenges, the CSE recommended that M.L. attend a 12:1:1 special class placement[2] for ten periods per week in both math and English language arts, two periods per week in social studies, and three periods per week in sciences in a "district non-specialized school."  (SRO Dec. 3 (citing IEP 17-18, 21)).  The CSE further recommended that M.L. receive the following services: one 30-minute counseling session per week in a group of three, one 30-minute occupational therapy session per week in a group of two, one 30-minute individual speech-language therapy session per week, and two 30-minute speech-language

---

[2]    "12:1:1" refers to the ratio of students to teachers and paraprofessionals.  *See Navarro Carrillo* v. *N.Y.C. Dep't of Educ.*, No. 21-2639, 2023 WL 3162127, at *1 n.1 (2d Cir. May 1, 2023) (summary order), *cert. denied sub nom.*, *Carrillo* v. *NYC Dep't of Educ.*, No. 23-461, 2024 WL 71995 (U.S. Jan. 8, 2024); *see also Zayas* v. *Banks*, No. 22 Civ. 7112 (KPF), 2024 WL 216761, at *2 n.2 (S.D.N.Y. Jan. 19, 2024), *aff'd*, No. 24-1076-cv, 2025 WL 1091225 (2d Cir. Apr. 8, 2025) (summary order).

therapy sessions per week in a group of three.  (SRO Dec. 3 (citing IEP 17-18); IHO Dec. 5).

The CSE outlined 12 goals for M.L. in the IEP.  (IEP 9-16).  By the end of the 2023-2024 school year, M.L.'s goals were to:

i.    [W]ith support of direct instruction and redirection in the classroom setting, … fluently add within 100,000 by using strategies and algorithms based on place value, properties of operations, and/or the relationship between addition and subtraction regrouping where needed.

ii.    [Do the same with respect to subtraction.]

iii.    [A]ccurately decode and encode CVC words.[3]

iv.    [D]evelop a personal narrative story with a logical problem and solution.

v.    [I]dentify the problem and solution of a story he reads on his functional level.

vi.    [F]ocus and be actively engaged in a classroom task for 10 minutes with no more than 1 refocusing prompt.

vii.    [P]lan out a three[-]step task[ ] and initiate[ ] and execute [that] task with no more than one verbal cue from [a] therapist to complete a classroom project.

viii.    [D]ecode words using phonics rules (ex: CVC, silent letters, vowel pairs, consonant digraphs, syllables, compound words, etc[.]) in various structured activities.

ix.    [O]rally produce target phonemes within all position of words, phrases, sentences, and progressing to spontaneous production in order to communicate effectively through modeling and fading of visual, tactile and auditory cues.

---

[3]    A "CVC" word is a simple consonant-vowel-consonant word, such as dog, cat, or sun. *See K.S. ex rel. L.S.* v. *Harrison Cent. Sch. Dist.*, No. 24 Civ. 6318 (CS), 2025 WL 3442916, at *2 (S.D.N.Y. Dec. 1, 2025).

    x.       [D]emonstrate improved recognition and interpretation of social cues.

    xi.      [E]xhibit age-appropriate social skills, demonstrating an improvement in his overall social abilities.

    xii.     [A]nswer comprehension questions involving making inferences, predictions, stating the main idea, and identifying two supporting details related to verbally presented information using grammatically correct simple, compound, and complex sentences, given fading visual/verbal prompts/cues.

(*Id.*).

The CSE did not consider a March 11, 2023 independent neuropsychological evaluation that Plaintiff had obtained from a private psychologist. (Pl. Br. 3-4; Record 193-228). Plaintiff faults DOE for not considering that evaluation, claiming DOE was not "interested in [it]" (Pl. Br. 3-4 (citing Record 336, 411)), but Plaintiff's accusation misstates matters. In fact, DOE did not have the evaluation at the time of the IEP meeting because Plaintiff did not provide it to DOE. (IHO Dec. 4). The SRO noted that the evaluation "was not shared with [DOE] even after it was requested by the student's special education teacher." (SRO Dec. 9).

Plaintiff's own record citations in support of her argument confirm that Plaintiff prevented the CSE from accessing the private evaluation. At Record page 336, M.L.'s fifth grade teacher explained that she had requested the evaluation "so I could include it in the IEP," but [M.L.]'s parents "did not respond to the request." (Record 336). Plaintiff's other Record citation, to page 411, says little of consequence, but two pages before, Plaintiff conceded that

she never "sen[t] a copy of [the evaluation] to the IEP team before the June 16, 2023 meeting." (Record 409-11).

### 2.    Administrative Proceedings

#### a.    Plaintiff Files a Due Process Complaint

After unilaterally withdrawing M.L. from public school and enrolling him in the Academy, Plaintiff filed a due process complaint against DOE on January 28, 2024, alleging that M.L.'s IEP failed to provide him a FAPE for the 2023-2024 school year. (SRO Dec. 3; Pl. Br. 6). As relief, Plaintiff sought an order directing DOE to fund M.L.'s tuition at the Academy for the 2023-2024 school year and to provide him with specialized transportation to and from the Academy. (SRO Dec. 3; Pl. Br. 6).

#### b.    The IHO Concludes That DOE Provided M.L. a FAPE

The IHO held a status conference on April 10, 2024, and a virtual impartial hearing on May 1, 2024. (IHO Dec. 3). The parties appeared at both proceedings and presented evidence and arguments at the hearing. (*See id.* at 3-4). In the end, the IHO dismissed Plaintiff's complaint with prejudice because she found that DOE had provided M.L. with a FAPE for the 2023-2024 school year. (*Id.* at 12).

The IHO organized her analysis by addressing four arguments Plaintiff advanced. *First*, Plaintiff alleged that DOE had "failed to assess [M.L.] in all areas of suspected disability generally." (IHO Dec. 8). But, to the contrary, the IHO instead found that DOE had assessed the student "for all suspected disabilities" and that "the hearing record does not support [Plaintiff's]

assertion" otherwise.  (*Id.*).  Moreover, she observed that DOE "is not required to evaluate and diagnose every possible disability, but required to address all of the student's needs."  (*Id.*).

*Second*, Plaintiff alleged that DOE "withdrew related services from [M.L.]'s IEP without further evaluation."  (IHO Dec. 8).  But the IHO found that DOE had withdrawn those services "due to [M.L.]'s progress."  (*Id.*).  Specifically, M.L.'s IEP "extensively discusses the progress [M.L.] made in physical therapy, compares [M.L.] to other same[-]aged peers, and determined that [M.L.]'s 'gross motor function does not impede[ ] [h]is ability to perform his academic activities at the same pace and quality as his peers.'"  (*Id.* (quoting IEP 7)).  The IEP also "notes that the parent and teachers are in agreement."  (*Id.*).  And regarding occupational therapy, "the IEP documents progress made by [M.L.] leading to the removal of one session[.]"  (*Id.*).

Plaintiff had also argued that DOE did not consider the independent neuropsychological evaluation she had obtained for M.L. and, in particular, its recommendation that M.L. continue with physical therapy.  (*See* IHO Dec. 8).  But the IHO found that DOE "did not have this information at the time of the IEP meeting."  (*Id.*).  Even if DOE did and failed to adopt its recommendations, the IHO explained that "such a failure would not have resulted in a violation of FAPE[,] as the law does not obligate the CSE to adopt the recommendations of a private psychologist."  (*Id.*).  And in any event, the IHO was "not inclined to afford the private evaluator's opinions and recommendations greater weight

11

than the judgment of district staff, which generally is afforded some amount of deference." (*Id.* at 9 (collecting cases)).

*Third*, Plaintiff alleged that she was "denied the opportunity to meaningfully participate in educational planning." (IHO Dec. 9). The IHO acknowledged that "[t]he IDEA sets forth procedural safeguards that include providing parents an opportunity 'to participate in meetings with respect to the identification, evaluation, and educational placement of the child'" (*id.* (quoting 20 U.S.C. § 1415(b)(1))), though the IHO also stated that "mere parental disagreement with a proposed IEP does not amount to a denial of meaningful participation" (*id.* (collecting cases)). And the IHO found that Plaintiff *was* afforded an opportunity to participate in the IEP process. (*Id.* at 10). Plaintiff "was present during the IEP meeting and provided input." (*Id.*). Prior to the meeting, "school staff and [Plaintiff] remained in close contact throughout the school year." (*Id.*). And Plaintiff was the one who "made the decision to not provide the neuropsychological evaluation to the school." (*Id.*). These reasons led the IHO to reject Plaintiff's third argument.

*Fourth*, Plaintiff took issue with the IEP's evaluation of [M.L.]'s "present levels of performance and goals," and argued that the IEP was "substantively deficient." (IHO Dec. 10). But the IHO found instead that M.L.'s "IEP and goals [were] reasonably calculated to allow [him] to make meaningful progress." (*Id.*).

To reach this conclusion, the IHO first recognized that a FAPE requires an IEP to (i) "include[ ] a statement of the student's present levels of academic achievement and functional performance" (*id.* (citing 34 C.F.R. § 300.320(a)(1);

8 N.Y.C.R.R. § 200.4(d)(2)(i))), (ii) "establish[ ] annual goals designed to meet the student's needs resulting from the student's disability and enable him or her to make progress in the general education curriculum" (*id.* (citing 34 C.F.R. § 300.320(a)(2)(i), (2)(i)(A); 8 N.Y.C.R.R. § 200.4(d)(2)(iii))), and (iii) "provide[ ] for the use of appropriate special education services" (*id.* (citing 34 C.F.R. § 300.320(a)(4); 8 N.Y.C.R.R. § 200.4(d)(2)(v))). The IHO found that M.L.'s IEP satisfied these requirements.

The IHO explained that the CSE reviewed results from two reports on M.L. — a "Psychoeducational Assessment" and a "Social History" — and the IHO found that the CSE did not consider the private neuropsychological evaluation "because the parent refused to provide it." (IHO Dec. 10). The CSE included M.L.'s special education teacher, assistant principal, physical therapist, and parent. (*Id.*). The CSE determined that M.L. was eligible for special education services "as a student with a disability classification of Speech or Language Impairment" and developed an IEP that allowed him "to make progress, in light of his circumstances." (*Id.*). The IHO specifically focused on M.L.'s math goals, commenting that the IEP anticipated "gradual" progress, including adding and subtracting "within the 100,000" by using certain "strategies and algorithms." (*Id.* at 11).

Although a witness for Plaintiff at the impartial hearing, Nancy Tritsch, testified that the IEP's goals were inappropriate, the IHO instead credited the testimony of M.L.'s special education teacher, who said the IEP's goals were "appropriate based on [M.L.'s] present levels and abilities based on her

13

knowledge of the student." (IHO Dec. 11; *see id.* at 14). The IHO also observed that the majority of goals later identified by the Academy were "the same or substantially similar" to those in M.L.'s IEP, and further observed that while M.L. was at the Academy, he had made progress toward the goals that DOE had developed for him in the IEP. (*Id.* at 11).

In conclusion, the IHO found that the IEP was "reasonably calculated, based on the information [DOE] had at the time, to enable [M.L.] to make progress appropriate with his abilities." (IHO Dec. 11). She also found that "the IEP establishes annual goals designed to meet [M.L.]'s needs resulting from [his] disability and enable[s] him to make progress." (*Id.*). Because the IHO determined that DOE had offered M.L. a FAPE for the 2023-2024 school year, she found it "unnecessary to reach the issue[s] of whether the [Academy] was an appropriate unilateral placement, or whether equitable considerations weighed in favor of [Plaintiff]." (*Id.*).

### c. The SRO Affirms that DOE Provided M.L. a FAPE

Dissatisfied with the IHO's findings, Plaintiff took an appeal to the SRO, but she fared no better. *First*, the SRO began with Plaintiff's argument that the IHO had erred by rejecting Plaintiff's contention that she was denied the opportunity to meaningfully participate in M.L.'s educational planning for the 2023-2024 school year. (SRO Dec. 7). Plaintiff's specific arguments to the SRO were that (i) DOE "did not respond to her concerns regarding [M.L.]'s progress"; (ii) "her concerns were not incorporated into the June 2023 IEP"; (iii) "the annual goals were not discussed during the June 2023 CSE meeting"; and

14

(iv) Plaintiff "was never advised of her legal rights or presented with a procedural safeguards notice." (*Id.* at 7).

To dispose of these arguments, the SRO began by recognizing the same IDEA procedural safeguards as the IHO had recognized. (SRO Dec. 7-8 (collecting cases)). The SRO agreed that the IHO had appropriately described the procedural safeguards and applicable case law, and he found that the IHO had correctly determined that Plaintiff was afforded an opportunity to participate in the IEP process such that M.L. was not denied a FAPE. (*Id.* at 8 (citing IHO Dec. 9-10)).

The SRO next affirmed the IHO's specific findings while adding his own. (SRO Dec. 8). Regarding Plaintiff's ability to voice her concerns, the SRO cited additional evidence "show[ing] that the June 2023 IEP reported the parent[s'] concerns at the time of the meeting," including M.L.'s father's goal for M.L. to be able to "write three sentences [without] support" and to "understand the concept of division as sharing." (*Id.* (internal quotation marks and citation omitted)). The SRO also noted that Plaintiff had testified at the impartial hearing that she was able to express concerns to the CSE during the IEP meeting. (*Id.*). Regarding M.L.'s annual goals, the SRO found that members of the CSE thoughtfully discussed them before the IEP meeting. (*See id.*). While the CSE did not discuss the goals "at great length" during the meeting itself, CSE members did discuss them before and, moreover, there was no evidence that Plaintiff "attempted to raise or discuss specific concerns related to [M.L.]'s annual IEP goals during the CSE meeting and was rebuffed by other members

15

of the CSE." (*Id.*).  To the contrary, Plaintiff "attended" and "participated" in the meeting.  (*Id.*).  The SRO thus concluded that any failure to discuss M.L.'s annual goals at the meeting "did not significantly impede [Plaintiff]'s opportunity to participate in the development of [M.L.]'s IEP."  (*Id.*).  Finally, the SRO found that DOE sent Plaintiff prior written notice of the relevant procedural safeguards.  (*Id.* at 9).

*Second*, the SRO turned to Plaintiff's argument that M.L.'s IEP was substantively deficient because it did not appropriately address M.L.'s needs and did not allow him to make meaningful progress.  (SRO Dec. 9).  As before, the SRO first affirmed the IHO's findings.  He summarized the evidence the IHO considered in determining — correctly, in the SRO's view — that M.L.'s IEP provided him a FAPE.  (*Id.* at 9-10).  That evidence included the information considered by the CSE: M.L.'s Psychoeducational Assessment and Social History and input from his special education teacher, assistant principal, physical therapist, and parent (but not the private neuropsychological evaluation because Plaintiff "refused to provide it").  (*Id.* at 9 (quoting IHO Dec. 10)).  The evidence also included M.L.'s specific diagnosis, academic areas where he struggled, and the discussion at the CSE meeting.  (*Id.*).

After reviewing the information the IHO considered, the SRO then discussed, at considerable length, additional information confirming his conclusion that M.L.'s IEP provided a FAPE.  (SRO Dec. 10-16).  The SRO began with an explication of M.L.'s Psychoeducational Assessment.  That Assessment reported M.L.'s parents' concerns that he had made minimal

16

progress since first grade.  (*Id.* at 10).  It explained that M.L. received services in pre-school in an 8:1:2 setting and transitioned to a 12:1:1 classroom upon entering kindergarten.  (*Id.*).  The Evaluation recognized that M.L. was "very impulsive," "had a short attention span, and was distracted by any visual stimuli," consistently made a variety of "awkward" body movements of which he was unaware, and had "poor executive functioning skills" and "extreme difficulty maintaining self-control."  (*Id.* (alteration adopted and internal quotation marks and citation omitted)).  He scored on the low-average range to extremely low range on a variety of tests — for IQ, visual-spatial skills, fluid reasoning skills, and working memory skills.  (*Id.* at 10-11).  The SRO also explained that the Assessment reported that M.L. was tested for autism through interviews conducted with his parent and teacher.  (*Id.* at 11).  The parent's results indicated that M.L. was in the "very likely range" for autism. (*Id.* (alterations adopted and internal quotation marks and citation omitted)). The teacher's results, however, fell within only the "probable range," so "the classification of Autism was reserved."  (*Id.* (alterations adopted and internal quotation marks and citation omitted)).

The SRO next discussed M.L.'s IEP, including its analysis of M.L.'s skills and his progress in various academic subjects.  In math, M.L. was at a first-grade level, with "minimal progress since his last IEP" but "some success" with "individual support, small group instruction, direct instruction, modeling, repetition, manipulatives, and guided practice."  (SRO Dec. 12).  In reading, he had "significant difficulty meaningfully participating in grade level curriculum."

(*Id.* at 11).  The IEP noted that M.L. "did not demonstrate automatic reading even when he knew all of the sounds," and "he needed to say each sound and then blend them to make a word."  (*Id.* (internal quotation marks omitted and alterations adopted) (quoting IEP 3)).  In writing, he "was at a kindergarten level, though he 'made progress on his goals and was participating more in the writing process.'"  (*Id.* at 12 (alteration adopted) (quoting IEP 3)).  Accordingly, the IEP determined that M.L.'s "academic, cognitive, language, and motor delays warranted an individualized, small, structured setting to progress in the general education curriculum."  (*Id.* at 12 (alterations adopted) (quoting IEP 8)).

Continuing with his independent review of the evidence, the SRO next considered the annual goals that the IEP set for M.L.  (SRO Dec. 12-14).  The SRO found that the annual goals "aligned with and targeted [M.L.]'s needs identified in the present levels of performance, appropriately addressed [his] needs, and were sufficiently specific and measurable to guide instruction and to evaluate [his] progress over the course of the school year."  (*Id.* at 14).  The SRO found M.L.'s 12 annual goals sufficient to provide M.L. a FAPE because they recognized his needs "consistent with his individual circumstances" — that is, they recognized that every child makes progress at different speeds. (*Id.*).  While the IEP did not describe the goals as "gradual or incremental" (contrary to Plaintiff's argument), the IEP recognized, in the words of M.L.'s special education teacher, that his progress was "consistent with his ability level."  (*Id.* (internal quotations marks and citation omitted)).

Finally, the SRO considered the IEP's recommendation of a 12:1:1 class placement.  (SRO Dec. 14-16).  Plaintiff had argued that the IEP failed to address M.L.'s "intrusive behavior" and did not allow him to make meaningful progress given his minimal progress under similar IEPs in prior years.  (*Id.* at 14).  The SRO, however, found the 12:1:1 placement recommendation appropriate.  (*See id.* at 14-16).  M.L.'s special education teacher had testified that he had made progress thanks to a "structured small-group setting and one-on-one support that provided differentiation and modeling manipulatives as well as the use of prompts and redirection."  (*Id.* at 15 (internal quotations marks and citation omitted)).  The IEP also indicated that M.L. had "some 'success' when working 1:1 with a teacher in math, 'accomplished some of his goals from last year in reading,' and made progress toward his writing goal."  (SRO Dec. 16 (alteration adopted) (quoting IEP 2-3)).  The SRO stated that M.L.'s progress under a prior IEP was a "relevant area of inquiry" for "purposes of determining whether an IEP has been appropriately developed, particularly if the parents express concern with respect to the student's rate of progress."  (*Id.* at 15 (collecting cases establishing that this principle is "well settled")).

Ultimately, the SRO concluded that because M.L. made progress "commensurate with his abilities" in the 2022-2023 school year, DOE's "recommendation for a similar program for the 2023-[20]24 school year, with modifications responsive to [M.L.]'s needs, was reasonably calculated to enable [him] to make appropriate progress in light of his circumstances."  (SRO Dec. 16).  And thus, "DOE offered [M.L.] a FAPE."  (*Id.*).  Like the IHO, the SRO

also declined to "reach a determination of whether [the Academy] was an appropriate unilateral placement for the 2023-24 school year or whether equitable considerations support[ ] [Plaintiff]'s requested relief," and it dismissed Plaintiff's claim.  (*Id.*).

### 3.    Proceedings in This Court

Again dissatisfied with the state administrative finding, Plaintiff commenced the instant action on September 11, 2024, by filing a Complaint seeking this Court's review of the SRO decision.  (*See* Dkt. #1 (Complaint filed September 11, 2024, with docketing error); Dkt. #9 (Complaint re-filed properly on September 19, 2024)).  DOE filed its answer on December 19, 2024.  (Dkt. #21).  Recognizing that this case would consist of a review of the underlying administrative record, the parties agreed not to seek discovery and instead sought leave to file cross-motions for summary judgment.  (Dkt. #22 at 1).  The Court granted the parties' joint request and adopted their proposed briefing schedule.  (Dkt. #23).  As a result, the Court did not require a Local Civil Rule 56.1 statement and instead directed the parties to "prepare and use a single appendix containing the administrative record from which they cite."  (*Id.*; *see generally* Record).

On March 19, 2025, Plaintiff requested to file the Record under seal (Dkt. #31), which request the Court granted (Dkt. #33).[4]  On March 25, 2025, Plaintiff filed her motion for summary judgment.  (Dkt. #34-35).  On April 22,

---

[4]    Although the Court repeatedly cites to the Record in this Opinion, it does not include references to the personally identifying information contained in the Record that motivated Plaintiff's sealing request.  (*See* Dkt. #31).

2025, Plaintiff submitted a letter correcting certain citation errors in her brief. (Dkt. #36).  On April 25, 2025, Defendant filed its cross-motion for summary judgment and opposition to Plaintiff's motion for summary judgment.  (Dkt. #37).  On May 27, 2025, Plaintiff filed her opposition to Defendant's cross-motion for summary judgment and reply in further support of her motion for summary judgment.  (Dkt. #39).  Finally, on June 23, 2025, Defendant filed its reply in further support of its cross-motion for summary judgment.  (Dkt. #40).

## DISCUSSION

### A.    Applicable Law

#### 1.    Standard of Review

As previously discussed, the IDEA enables a party aggrieved by an SRO's findings to bring a civil action challenging those findings in state or federal court.  20 U.S.C. § 1415(i)(2)(A).  When such an action is brought in federal court, "the parties and the court typically style the decision as a ruling on a motion for summary judgment, but 'the procedure is in substance an appeal from an administrative determination, not a summary judgment motion.'"  *Bd. of Educ. of Yorktown Cent. Sch. Dist.* v. *C.S.*, 990 F.3d 152, 165 (2d Cir. 2021) (quoting *M.H.* v. *N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012)).  The court thus "engage[s] in an independent review of the administrative record and make[s] a determination based on a preponderance of the evidence."  *M.H.*, 685 F.3d at 240 (internal quotation marks omitted).  Nonetheless, the court "must give due weight to [the state administrative] proceedings, mindful that the judiciary generally lacks the specialized knowledge and policy experience

21

necessary to resolve … difficult questions of educational policy." *Id.* (internal quotation marks omitted); *see also Bd. of Educ* v. *Rowley*, 458 U.S. 176, 206 (1982) ("[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.").

Moreover, where (as here) the SRO and the IHO agree, "[d]eference to the conclusions of the administrators on this issue is particularly appropriate." *C.H.* v. *Goshen Cent. Sch. Dist.,* No. 11 Civ. 6933 (CS), 2013 WL 1285387, at *12 (S.D.N.Y. Mar. 28, 2013); *see also B.K.* v. *N.Y.C. Dep't of Educ.,* 12 F. Supp. 3d 343, 360 (E.D.N.Y. 2014) ("[D]eference is particularly apt where the IHO and SRO decisions are in agreement and are based on the same record as that before the district court."); *Bird* v. *Banks,* No. 22 Civ. 8049 (JGK), 2023 WL 8258026, at *4 (S.D.N.Y. Nov. 29, 2023) (similar).  Additionally, "more deference is due" where (as here) "this Court's determination rests solely on the same evidence presented to the SRO." *E.H.* v. *N.Y.C. Dep't of Educ.,* 164 F. Supp. 3d 539, 547 (S.D.N.Y. 2016).  That said, "judicial deference is not absolute" if the SRO's decision is poorly reasoned or not "based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *T.F.* v. *N.Y.C. Dep't of Educ.,* No. 14 Civ. 3401 (WHP), 2015 WL 5610769, at *3 (S.D.N.Y. Sept. 23, 2015) (quoting *M.H.*, 685 F.3d at 244).

### 2.    The *Burlington/Carter* Test for Tuition Reimbursement

In 1985, the Supreme Court recognized the right of parents who disagree with their child's proposed IEP to unilaterally withdraw their child from public school and place him in private school.  *Sch. Comm. of Burlington* v. *Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985).  The Court further held that the IDEA authorizes a district court to order school authorities to retroactively reimburse parents for the cost of tuition at that private school, should the court determine that the "private placement desired by the parents was proper under the [IDEA] and that an IEP calling for placement in a public school was inappropriate."  *Id.* at 366-67.  In 1993, the Court expanded upon the *Burlington* decision, holding that a parent's private placement need not meet all of the requirements of the IDEA to qualify for reimbursement, so long as the placement is otherwise "proper" under the IDEA.  *Florence Cnty. Sch. Dist. Four* v. *Carter ex rel. Carter*, 510 U.S. 7, 10 (1993).

The Court's decisions in these two cases spawned the *Burlington/Carter* test, which governs claims seeking tuition reimbursement under IDEA.  *See C.F. ex rel. R.F.* v. *N.Y.C. Dep't of Educ.*, 746 F.3d 68, 71 & n.1 (2d Cir. 2014).  Under the *Burlington/Carter* test, a district court may order the state to reimburse the parents of a child who was unilaterally placed in private school if: "[i] the [state agency]'s proposed placement violated the IDEA, [ii] the parents' alternative private placement was appropriate, and [iii] equitable considerations favor reimbursement."  *T.M. ex rel. A.M.* v. *Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 152 (2d Cir. 2014); *accord Neske* v. *N.Y.C. Dep't of Educ.*,

23

No. 22-2962-cv, 2023 WL 8888586, at *1 (2d Cir. Dec. 26, 2023) (summary order). Under New York Education Law § 4404(1)(c), DOE bears the burden on the initial prong, while the student's parents bear the burden of establishing the second and third prongs. *R.E.* v. *N.Y.C. Dep't of Educ.*, 694 F.3d 167, 184-85 (2d Cir. 2012).

Importantly, if a court determines that the state agency's proposed placement did not violate the IDEA — *i.e.*, if it finds in the negative on the first prong — "it need not consider the remaining two prongs of the *Burlington-Carter* test." *P.K. ex rel. S.K.* v. *N.Y.C. Dep't of Educ.*, 819 F. Supp. 2d 90, 104 (E.D.N.Y. 2011), *aff'd*, 526 F. App'x 135 (2d Cir. 2013) (summary order); *accord M.C. ex rel. Mrs. C.* v. *Voluntown Bd. of Educ.*, 226 F.3d 60, 66 (2d Cir. 2000); *Zayas* v. *Banks*, No. 22 Civ. 7112 (KPF), 2024 WL 216761, at *2 (S.D.N.Y. Jan. 19, 2024), *aff'd*, No. 24-1076-cv, 2025 WL 1091225 (2d Cir. Apr. 8, 2025) (summary order).

### 3. Free Appropriate Public Education

Focusing on the first prong of the *Burlington/Carter* test, the Supreme Court has provided a standard "for determining 'when handicapped children are receiving sufficient educational benefits to satisfy the requirements of the [IDEA].'" *Endrew F. ex rel. Joseph F.* v. *Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 390 (2017) (quoting *Rowley*, 458 U.S. at 202). In order to provide a child with a FAPE, "a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 399. Though this standard is somewhat flexible, *see id.* at 402 (describing "a

24

general standard, not a formula"), the Supreme Court has supplied some additional guardrails. "[A]n educational program providing merely more than *de minimis* progress from year to year" does not suffice. *Id.* (internal quotation marks omitted). Rather, a child's "educational program must be appropriately ambitious in light of his circumstances." *Id.*

The Second Circuit has built on *Endrew F.*'s general standard. It has clarified that while the "IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP," "the door of public education must be opened for a disabled child in a 'meaningful' way." *Walczak* v. *Fla. Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998) (quoting *Rowley*, 458 U.S. at 192); *accord Mr. P* v. *W. Hartford Bd. of Educ.*, 885 F.3d 735, 757 (2d Cir. 2018); *Doe* v. *E. Lyme Bd. of Educ.*, 962 F.3d 649, 663 (2d Cir. 2020) ("*Doe II*"). A child's IEP must therefore be "likely to produce progress, not regression." *Mr. P*, 885 F.3d at 757 (quoting *A.M.* v. *N.Y.C. Dep't of Educ.*, 845 F.3d 523, 541 (2d Cir. 2017)). Mere "trivial advancement" is not enough. *Walczak*, 142 F.3d at 130; *see also Mr. P*, 885 F.3d at 757 (emphasizing that the IDEA is not satisfied with just "*any* progress above the floor of 'trivial advancement.'" (quoting *Cerra* v. *Pawling Cent. Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005))). Rather, an "IEP must be reasonably calculated to provide some 'meaningful' benefit." *Mrs. B.* v. *Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir. 1997) (quoting *Rowley*, 458 U.S. at 192).[5]

---

[5]    Though some of these cases predate *Endrew F.*, the Second Circuit has confirmed that "*Endrew* [*F.*] does not signal a change in the law of this Circuit." *Doe* v. *E. Lyme Bd. of Educ.*, 962 F.3d 649, 664 (2d Cir. 2020); *see also Mr. P* v. *W. Hartford Bd. of Educ.*, 885

Nevertheless, a FAPE does not entail "everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (internal quotation marks and citation omitted); *see also J.R.* v. *N.Y.C. Dep't of Educ.*, 748 F. App'x 382, 386 (2d Cir. 2018) (summary order). An "IEP need not 'furnish every special service necessary to maximize each handicapped child's potential.'" *Doe II*, 962 F.3d at 663 (quoting *Doe* v. *E. Lyme Bd. of Educ.*, 790 F.3d 440, 450 (2d Cir. 2015) ("*Doe I*")). So, if progressing smoothly through the regular curriculum "is not a reasonable prospect for a child, his IEP need not aim for grade-level advancement." *Endrew F.*, 580 U.S. at 402. Indeed, the "IDEA … does not demand adherence with specific educational standards or curricula." *Killoran* v. *Westhampton Beach UFSD*, No. 21-2647, 2023 WL 4503151, at *3 (2d Cir. July 13, 2023) (summary order). At bottom, an IEP need only provide a "basic floor of opportunity." *Rowley*, 458 U.S. at 201.

## B.    Analysis

Plaintiff argues that the SRO's decision fails all elements of the *Burlington/Carter* test. (*See generally* Pl. Br.). She devotes most of her brief to the first element (sensibly, considering the IHO and the SRO both found that element dispositive), contending that the Court should not defer to the SRO's findings because (i) the IHO's and the SRO's decisions run afoul of the standard articulated in *Endrew F.*, (ii) M.L.'s performance in the prior school year cannot predict his success in a 12:1:1 class in the 2023-2024 school year,

---

F.3d 735, 757 (2d Cir. 2018) ("Prior decisions of this Court are consistent with the Supreme Court's decision in *Endrew F.*").

(iii) the IHO and the SRO decisions fail to grapple with contrary evidence, and (iv) a grab-bag of additional arguments.  Plaintiff's arguments do not persuade the Court.  Rather, the Court agrees with the IHO and the SRO that DOE provided M.L. a FAPE.

### 1.     The IHO and SRO Decisions Comply with *Endrew F.*

Plaintiff first argues that DOE did not provide M.L. a FAPE because the IEP "offered and promised M.L. only more of the same — minimal and nominal progress."  (Pl. Br. 17).  *Endrew F.,* Plaintiff says, requires more.  (*Id.* at 17-18).  Plaintiff also submits that certain improvements M.L. apparently made while enrolled at the Academy underscore the inadequacy of the progress outlined for him in his IEP.  (*Id.* at 17).  But Plaintiff's arguments fail for two reasons.

For starters, Plaintiff mischaracterizes the standard an IEP must satisfy in order to provide a FAPE under *Endrew F.* and its progeny.  Plaintiff fixates on the notion that an IEP must prescribe a goal of "meaningful" progress.  (*See* Pl. Br. 14, 17-18; Pl. Reply 4, 7-10, 12).  But Plaintiff's laser focus on this one word neglects all the additional language that contextualizes and fleshes out the FAPE standard.

All progress is measured "in light of the child's circumstances."  *Endrew F.,* 580 U.S. at 399.  That is, an IEP must be "reasonably calculated" in light of every particular child's unique situation.  *Id.*  So while an IEP must be "*appropriately* ambitious," a child's specific circumstances temper that ambition.  *Id.* at 402 (emphasis added).  And while a child's IEP must indeed open the door of public education in a "meaningful" way, *see Walczak,* 142

27

F.3d at 130, the IEP must also take into account what is realistically achievable for the child, *see Endrew F.,* 580 U.S. at 399-403. In other words, just as every child is unique, so too is the measure of their progress. The IDEA does not promise success, nor does it mandate everything that parents may wish their children could achieve; instead, it requires only that a school district provide a basic floor of opportunity for a child to make progress beyond the level of trivial advancement. *Walczak*, 142 F.3d at 132; *Doe II*, 962 F.3d 663; *Rowley*, 458 U.S. at 201.

The Court recognizes that this standard defining a FAPE is not rigid. It is intentionally malleable in recognition of every child's differing circumstances. It is also sufficiently specific to evaluate the appropriateness of M.L.'s IEP. So long as M.L.'s IEP presented him with a chance to improve academically — measuring from his own baseline and defining his progress with reference to his unique disabilities and their consequences — DOE provided him a FAPE. Here, the Court agrees with the IHO and the SRO that DOE has done just that.

To start, the IEP recognized M.L.'s challenges. He has serious speech and language impairments (IEP 1-5); difficulties with executive functioning, self-control, attention, and impulsivity (SRO Dec. 14 (citing IEP 2, 4-5, 7)); and "extremely low range" IQ and verbal skills (*id.* at 10 (alterations adopted and internal quotation marks and citation omitted)). Given these circumstances, the 12 goals the IEP prescribed were reasonably calculated to enable M.L.'s progress. *See Endrew F.,* 580 U.S. at 399.

In math, for example, M.L.'s goal of adding and subtracting up to 100,000 was appropriately ambitious in light of his existing first-grade-level ability only to add and subtract up to the hundreds place.  (*See* SRO Dec. 13 & n.10; IHO Dec. 4).  In reading, M.L. had "significant difficult[ies]," including his inability to automatically read "even when he knew all the sounds" and his need "to say each sound and then blend them to make a word."  (SRO Dec. 11 (alterations adopted and internal quotation marks and citation omitted)).  So M.L.'s goals — to understand CVC words, identify the problem and solution of a story, decode words using phonics rules, and produce target phonemes (IEP 10-14) — were well tailored to his skill level and appropriately ambitious. In writing, because M.L. operated at a kindergarten level (SRO Dec. 11), his goal to "develop a personal narrative story with a logical problem and solution" two times per month "over three separate stories" was likewise commensurate with his abilities and appropriately ambitious (IEP 11).

The Court appreciates that Plaintiff may wish for M.L. to make greater progress, and it is understandable that she lays this responsibility at DOE's feet.  But just because Plaintiff wants more for her son does not mean that DOE can make it so.  More to the point, it does not mean that the IDEA mandates the allocation of public funds to maximize her son's potential.  *See Doe II*, 962 F.3d 663; *Walczak*, 142 F.3d at 130 ("[B]ecause public 'resources are not infinite,' federal law 'does not secure the best education money can buy.'" (quoting *Lunceford* v. *D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984))).  That said, while the Court acknowledges that M.L.'s IEP need not

29

equip him with every last tool to ensure his success, it wishes to be clear:  The Court does not believe M.L.'s IEP is unambitious or that the CSE was content to let his progress stagnate.  Rather, the Court finds that a group of educators who personally knew M.L. carefully considered his then-existing capabilities and limitations and created a plan that would help him make reasonable progress relative to his baseline.  Such tailoring of M.L.'s IEP is adequate to constitute a FAPE.

Plaintiff's argument also fails for the additional reason that it relies on impermissible evidence.  Specifically, Plaintiff contends that M.L. made significant progress once placed in the Academy, which demonstrates the inadequacy of the IEP's goals for him.  (Pl. Br. 17 ("The progress attained by M.L. at [the Academy] in a short period casts a long shadow over the IEP.")).  But Plaintiff may not rely on this evidence because it accrued after the development of the IEP.

As a general rule, an "IEP must be evaluated prospectively as of the time of its drafting."  *R.E.*, 694 F.3d at 186.  In this case, that means the Court cannot consider most retrospective evidence of progress M.L. has made since the IEP's issuance.  *See id.*; *J.M.* v. *N.Y.C. Dep't of Educ.*, No. 12 Civ. 8504 (KPF), 2013 WL 5951436, at *18-19 (S.D.N.Y. Nov. 7, 2013).  The Second Circuit adopted this rule to prevent schools from effecting a "bait and switch" by "rehabilitat[ing] a deficient IEP after the fact."  *R.E.*, 694 F.3d at 186.  But it applies with equal force to parents who unilaterally withdraw their child from public school and later seek to impugn an IEP with a progress report generated

by their child's new private school.  *See J.M.*, 2013 WL 5951436, at \*19 (articulating precisely this point).  Here, "[a]llowing Plaintiff[ ] to undo the 20[23]-[2024] IEP on this basis would conflict with *R.E.*'s basic proscription against using retrospective evidence to undo what was an appropriate IEP at the time it was written."  *Id.*  Plaintiff's mention of M.L.'s apparent progress at the Academy therefore does not disturb the Court's determination that the IEP provided M.L. a FAPE.[6]

> **2.  To the Extent the IHO and the SRO Failed to Recognize That M.L.'s Class was Under Capacity in the Prior School Year, That Failure Does Not Render Inappropriate the IEP's 12:1:1 Recommendation for the Upcoming School Year**

Plaintiff next contends that the IHO's and the SRO's decisions are infirm because they failed to recognize that M.L.'s class in the prior school year had only seven students.  (Pl. Br. 18-19).  Although that class was also designated 12:1:1, Plaintiff explains it was not at capacity.  (*Id.*).  Plaintiff argues that the IHO's and the SRO's failures to recognize the under-capacity of M.L.'s 2022-2023 class mean that they could not have properly evaluated the appropriateness of M.L.'s 2023-2024 class, which could have had the

---

[6]  The Court acknowledges that the IHO and the SRO each relied on retrospective evidence in one instance — to observe that the majority of the goals identified by the Academy were "the same or substantially similar" to those developed in the IEP, and that M.L. "did make progress towards the goals [DOE] developed while attending the Academy."  (IHO Dec. 11; SRO Dec. 13).  But an adjudicator may sometimes consider retrospective evidence to confirm the appropriateness of an IEP:  "While testimony that materially alters the written plan is not permitted, testimony may be received that explains or justifies the services listed in the IEP."  *R.E.* v. *N.Y.C. Dep't of Educ.*, 694 F.3d 167, 186 (2d Cir. 2012).  Moreover, even if the IHO and the SRO had improperly considered this evidence (and the Court does not believe they did), this evidence constituted little more than an aside, and the decisions would remain sound even without it.

31

maximum of 12 students and therefore less individualized attention for M.L. (*Id.*).

But the IHO's and the SRO's failures to consider the under-capacity of M.L.'s class in the prior year do not impair their decisions.  Plaintiff is correct that the IHO and the SRO did not discuss M.L.'s actual class size in the prior year.  But focusing in particular on the SRO's decision, it nevertheless specifically assessed the appropriateness of a 12:1:1 placement for M.L. during the upcoming school year.  (SRO Dec. 14-16).  The SRO recognized the importance of individualized attention within M.L.'s 12:1:1 class; he discussed that M.L.'s progress was thanks to a "structured small-group setting and one-on-one support[.]"  (*Id.* at 15 (internal quotation marks and citation omitted)).  And the SRO also acknowledged that M.L. had "some success when working 1:1 with a teacher in math."  (*Id.* at 16).  So rather than failing to discuss the importance of small class size, the SRO instead found that even within a 12:1:1 class, there was opportunity for M.L. to progress under individualized attention.

Plaintiff also correctly points out that the SRO relied on M.L.'s progress in a 12:1:1 class during the 2022-2023 school year to support his determination that a 12:1:1 placement would continue to be appropriate in the ensuing year — which, Plaintiff reiterates, is problematic because the SRO did not acknowledge that the 2022-2023 class was under capacity.  But the Court is hesitant to disturb the SRO's conclusion that a 12:1:1 placement was appropriate solely because the SRO did not discuss the possibility of a different

student-to-teacher-to-aide ratio than the maximum prescribed in the IEP. As just mentioned, the SRO recognized that this class size would still leave room for individualized attention.

Moreover, as a general matter, "[c]ourts in this district have found that challenges to class size and student teacher ratios 'involve questions of methodology more appropriately answered by the state and district decision-makers than by federal judges.'" *C.M.* v. *N.Y.C. Dep't of Educ.*, No. 15 Civ. 6275 (ER), 2017 WL 607579, at *21 (S.D.N.Y. Feb. 14, 2017) (quoting *P.S.* v. *N.Y.C. Dep't of Educ.*, No. 13 Civ. 4772 (LGS), 2014 WL 3673603, at *10 (S.D.N.Y. July 24, 2014)). An "SRO's conclusion" on this front "is 'exactly the sort of policy judgment on which the Second Circuit has instructed that this court should defer to the SRO.'" *Id.* (quoting *C.W.* v. *City Sch. Dist. of the City of N.Y.*, 171 F. Supp. 3d 126, 135 (S.D.N.Y. 2016)). The Court will exercise such deference here. Indeed, there is much the Court does not know. For example, M.L. has been in 12:1:1 class placement since kindergarten. (SRO Dec. 10). This Court does not know the capacity of each of M.L.'s prior classes, nor does it know whether his success has varied based on capacity. The SRO is in a far better position to make such a judgment.

For these reasons, the Court defers to the SRO's determination that a 12:1:1 class size was an appropriate recommendation for the 2023-2024 school year and that DOE did not fail to provide M.L. a FAPE on these grounds.

### 3. The IHO's and the SRO's Decisions Did Not Err in Failing to Consider Plaintiff's Contrary Evidence

Plaintiff next argues that the decisions of the IHO and the SRO are due no deference because they failed to engage with Plaintiff's evidence and with a 2022 DOE Psychoeducational Assessment. (Pl. Br. 19-22). The specific evidence Plaintiff faults the IHO and the SRO for failing to address is the testimony of Plaintiff's witness, Ms. Tritsch, who was M.L.'s teacher at the Academy. (*Id.*; *see* Record 237-38). Ms. Tritsch testified that the IEP's goals were too advanced for M.L. and did not align with his disabilities, that the IEP failed to provide M.L. sufficient support, and that he was making progress in a small class at the Academy. (Pl. Br. 21-22).

The IHO and the SRO did not need to consider Ms. Tritsch's evidence for a variety of reasons. As the Court already explained, an adjudicator generally cannot consider retrospective testimony designed to impugn (or rehabilitate) an IEP, particularly when that testimony contains information unavailable to the CSE at the time it developed the IEP. *See R.E.*, 694 F.3d at 186; *J.M.*, 2013 WL 5951436, at *18-19. For this reason, the IHO and the SRO did not err by omitting Ms. Tritsch's testimony from their decision, and the Court will not evaluate the testimony either. In fact, it appears that the IHO *did* consider Ms. Tritsch's testimony; she discussed Plaintiff's "school witness," who "testified that the [DOE]'s IEP goals were in appropriate for the student." (IHO Dec. 11). By extension, then, the SRO considered this testimony too, at least when reviewing the IHO's decision.

But even if the IHO and the SRO did not consider Ms. Tritsch's testimony, that was permissible for another reason. The "'mere fact that a separately hired expert has recommended different programming does nothing to change the deference' to the [school] district and its trained educators." *E.S. ex rel. B.S.* v. *Katonah-Lewisboro Sch. Dist.,* 742 F. Supp. 2d 417, 436 (S.D.N.Y. 2010) (alterations adopted) (quoting *Watson* v. *Kingston City Sch. Dist.*, 325 F. Supp. 2d 141, 145 (N.D.N.Y. 2004), *aff'd*, 142 F. App'x 9, 10 (2d Cir. 2005) (summary order)), *aff'd*, 487 F. App'x 619 (2d Cir. 2012) (summary order). And failure to consider the testimony of a plaintiff's expert "cannot 'overcome the particularly important deference that we afford the SRO's assessment of the [IEP]'s substantive adequacy.'" *C.L.K.* v. *Arlington Sch. Dist.*, No. 12 Civ. 7834 (NSR), 2013 WL 6818376, at *14 (S.D.N.Y. Dec. 23, 2013) (quoting *Cerra,* 427 F.3d at 195). Although it is not clear to the Court whether Ms. Tritsch qualifies as such an expert, it nevertheless finds these principles of deference persuasive.

Finally, even were an adjudicator to consider Ms. Tritsch's testimony, she could discredit it (just as the IHO seems to have done). *First,* many of the Academy's goals for M.L. were substantially similar to those in the IEP. (IHO Dec. 11; SRO Dec. 13). This would appear to undercut Ms. Tritsch's view that the IEP's goals were misaligned with M.L.'s skills and that the Academy so surpassed the IEP in enabling M.L.'s progress as to render the IEP inappropriate. *Second,* Ms. Tritsch's contention that the IEP's goals were too

35

advanced for M.L. directly contradicts Plaintiff's position that the IEP did not provide M.L. a FAPE because its goals were not advanced enough.

Relatedly, Plaintiff's contention that the IHO and the SRO failed to consider the Psychoeducational Assessment is patently incorrect. As the Court summarized in the above procedural history, the IHO discussed the evaluation (IHO Dec. 5-6), and so did the SRO (SRO Dec. 9-12). The Court therefore rejects Plaintiff's argument that it should disregard the IHO's and the SRO's decisions because they failed to engage with Plaintiff's contrary evidence.

### 4. Plaintiff's Remaining Arguments Fail

Plaintiff also attacks the IHO's and the SRO's decisions for failing to (i) evaluate M.L. for all of his suspected disabilities and (ii) conduct a functional behavior analysis in violation of 8 N.Y.C.R.R. § 200.4(b)(1)(v). (Pl. Br. 23-24; Dkt. #36 (correcting N.Y.C.R.R. citation)). It is difficult for the Court to evaluate Plaintiff's first claim because she does not specify which disabilities the IHO or the SRO failed to address. Indeed, it appears that Plaintiff has never clarified this argument. The IHO explained that Plaintiff "did not allege any facts" before her to support Plaintiff's allegation that DOE had failed to assess M.L. for all his suspected disabilities. (IHO Dec. 8). Before this Court, Plaintiff seizes on a separate statement from the IHO that a school district "is not required to evaluate and diagnose every possible disability, but [rather is] required to address all of the student's needs." (*Id.*). But the IHO made this statement in an abundance of caution and as a back-up to her primary assertion that Plaintiff never alleged facts to support her claim in the first

place. (*Id.*). And perhaps more fundamentally, Plaintiff's argument falls because the IHO explicitly repudiated it; the IHO found that DOE had "assessed [M.L.] for all suspected disabilities." (*Id.*). The Court is therefore unmoved by Plaintiff's first argument.

As for her second argument regarding 8 N.Y.C.R.R. § 200.4(b)(1)(v), Plaintiff asserts that DOE violated the statute by failing to conduct a "functional behavioral assessment for a student whose behavior impedes his or her learning or that of others, as necessary to ascertain the physical, mental, behavioral and emotional factors which contribute to the suspected disabilities." 8 N.Y.C.R.R. § 200.4(b)(1)(v). (*See* Pl. Br. 24). Not so.

As an initial matter, if the CSE determines that "additional data are not needed, the school district must notify the parents of that determination and the reasons for it[.]" 8 N.Y.C.R.R. § 200.4(b)(5)(iv). The parents then have the right to request an assessment, but the "school district is not required to conduct the assessment unless requested to do so by the student's parents." *Id.* "In other words, '[a]ny additional assessments need only be conducted if found necessary to fill in gaps in the initial review of existing evaluation data,'" *C.M.*, 2017 WL 607579, at *15 (quoting *D.B. ex rel. E.B.* v. *N.Y.C. Dep't of Educ.*, 966 F. Supp. 2d 315, 329-30 (S.D.N.Y. 2013)), or if the parents request such an assessment. Here, Plaintiff does not claim to have made such a request; rather, she appears to argue that DOE violated an affirmative obligation it had to conduct a functional behavioral assessment. But the record suggests that

the school district determined such an assessment was unnecessary and that Plaintiff failed to lodge a request to conduct one.

In any event, "[f]ailure to conduct [a functional behavioral assessment] does not render an IEP legally inadequate under the IDEA so long as the IEP adequately identifies a student's behavioral impediments and implements strategies to address that behavior." *M.W. ex rel. S.W.* v. *N.Y.C. Dep't of Educ.*, 725 F.3d 131, 140 (2d Cir. 2013). And "whether an IEP adequately addresses a disabled student's behaviors and whether strategies for dealing with those behaviors are appropriate are 'precisely the type of issue[s] upon which the IDEA requires deference to the expertise of the administrative officers.'" *Id.* (quoting *A.C. ex rel. M.C.* v. *Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 172 (2d Cir. 2009)). Here, the Court defers to the findings of the SRO, who discussed M.L.'s behavioral issues and determined that the IEP appropriately addressed them. (SRO Dec. 8-11).

Consequently, the Court is not persuaded by Plaintiff's remaining arguments that M.L.'s IEP failed to provide him a FAPE.[7]

---

[7]    Because the Court holds that DOE has met the first prong of the *Burlington/Carter* test by providing M.L. a FAPE, it declines to reach Plaintiff's arguments on the second and third prongs. (*See* Pl. Br. 24-30).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment is DENIED and Defendant's cross-motion for summary judgment is GRANTED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

Dated:    March 11, 2026
          New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

39